IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| WELLS FARGO BANK, National Association, *et al.*, | ) ) ) | 4:10CV3120 |
| Plaintiffs, | ) ) | **MEMORANDUM** |
| v. | ) ) | **AND ORDER** |
| CLARK E. BETTENHAUSEN, | ) ) | |
| Defendant. | ) ) | |

    The plaintiff, Wells Fargo Bank, N.A. ("Wells Fargo") seeks to recover a money judgment against the defendant, Clark E. Bettenhausen ("Bettenhausen"), for default on a promissory note and on a guaranty of promissory notes. Bettenhausen, who appears pro se, has counterclaimed against Wells Fargo and three individuals, alleging fraud and violations of consumer protection laws.[1] The counterclaims are in the nature of affirmative defenses.

    On October 29, 2010, Bettenhausen filed a "motion to object to Trev Peterson's motions to liquidate collateral." (Filing 33.) The motion was denied by Magistrate Judge Cheryl R. Zwart on November 2, 2010. Judge Zwart noted that the motion "appear[ed] to seek a ruling on the factual merits of Wells Fargo's claims as set forth in its amended complaint" but was "not properly supported by evidence or argument as required under the Federal Rules of Civil Procedure and the Nebraska Civil Rules." (Filing 34.) On November 29, 2010, Bettenhausen filed a motion for reconsideration and attached certain evidence. (Filing 36.) Judge Zwart liberally construed this filing

---

[1] This action originated in the District Court of Lancaster County, Nebraska, but was removed to federal court by Bettenhausen, based on diversity jurisdiction, after filing an answer and counterclaim in which he named as additional "plaintiffs" Trev E. Peterson, Jerald D. Lundgren, and Steven Blocher.

as a motion for summary judgment and gave Wells Fargo until January 12, 2011. (Filing 43.) Wells Fargo (and the additional plaintiffs/counterdefendants) responded on January 10, 2011, by filing its own motion for summary judgment. (Filing 46.) After careful review, I find that Bettenhausen's motion should be denied, and that Wells Fargo's motion should be granted.

## *I. Background*

In accordance with the requirements of our local rules, *see* NECivR 56.1(a), Wells Fargo has included in its supporting brief a statement of material facts, which consists of 80 numbered paragraphs with appropriate references to filed evidentiary materials. (Filing 48.) Because Bettenhausen has not controverted Wells Fargo's statement of material facts, it is deemed admitted. *See* NECivR 56.1(b)(1) ("Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response.") (emphasis in original).[2] Thus, except as noted below, these facts are undisputed:

> 1. The Wells Fargo's claim against Bettenhausen is evidenced by a series of promissory notes, and is secured by the [sic] Bettenhausen's house, by a commercial lot, and by the inventory, machinery and equipment, and other personal property owned by Industrial Fabricators,

---

[2] The opposing party's response "should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies." NECivR 56.1(b)(1). Bettenhausen merely claims in his response, without citing any evidence, that there are disputes concerning "[t]he owner of the notes and mortgages," "validity of the loans," "amounts owed," "[a]ssignments of house and land notes," "Closing Documents," "Wells Fargo[']s ability to foreclose," and "[r]eal estate taxes paid." (Filing 52, at 2.) The fact that Bettenhausen is not represented by counsel does not relieve him of the obligation to comply with our local rules. *See* NEGenR 1.3(g) ("Unless stated otherwise, parties who proceed pro se are bound by and must comply with all local and federal procedural rules.")

Inc. or by Mr. Bettenhausen. (Blocher Affidavit (Fil No. 47-2; hereinafter the "Blocher Affidavit"); (Certified Copy of Lundgren Declaration in the Second Bankruptcy Case (Fil. No. 47-4 pages 1-39 and Fil 47-5 pages 1-21 hereinafter the "Lundgren Declaration". . .).

2. That the notes evidencing the Wells Fargo claim are all cross collateralized and cross defaulted. (Blocher Affidavit at ¶¶3 and 4).[3]

3. On October 25, 2005 Bettenhausen filed a Chapter 13 bankruptcy proceeding in the United States Bankruptcy Court for the District of Nebraska on October 25, 2005 at BK05-85870 (the "First Bankruptcy Case") (Fil. 47-1 the "Peterson Affidavit" at ¶5). That the First Bankruptcy case was dismissed on April 9, 2008. (Peterson Affidavit at ¶5 and Exhibit 5 thereto).

4. Bettenhausen filed a second Chapter 13 case on February 2, 2009 in the United States Bankruptcy Court for the District of Nebraska at BK 09-80223 (the "Second Bankruptcy Case"). (Fil. 47-1 at pages 6-10 Certified Copies of Bankruptcy filings from the Second Bankruptcy Case, hereinafter referred to as "CC1 at [page number]." For the certified copies at Filing No. 47-4 and 47-5, the reference will be to CC2 at [page number] for Filing No. 47-4 and CC3 at [page number] for Filing No. 47-5).

5. That the trust deed describing Bettenhausen's home secures the Home Note and Bettenhausen's guaranty of the Industrial Fabricator's debt.[4] The terms of the trust deed limit the amount of the lien of Wells Fargo in the home to $28,800.00 in principal. (Blocher Affidavit at ¶ 5 and Ex. 18).

---

[3] This is a legal conclusion which is not deemed admitted.

[4] The evidence does not support this statement.  Bettenhausen's guaranty is marked "unsecured." (Blocher Affidavit Ex. 17 (filing 47-2, at 40).) By its terms, the deed of trust describing Bettenhausen's home only secures a note for $28,800.00 which Bettenhausen executed on September 6, 2001.  (Blocher Affidavit Ex. 18 (filing 47-2, at 41).)

3

6. That all of the notes to Industrial Fabricators are secured by the commercial lot, the amount of the lien of Wells Fargo secured by the commercial lot is limited to $210,000.00, which exceeds the value of the commercial lot. (Blocher Affidavit at ¶6 and Ex. 19).

7. That a proof of claim was filed on behalf of Wells Fargo in the Second Bankruptcy Case (CC1 at 1-5).

8. Bettenhausen, then appearing pro se in the Second Bankruptcy Case, filed an objection to the Wells Fargo proof of claim in the Second Bankruptcy Case. (CC3 at 22-23) and Wells Fargo filed a resistance to the Objection (CC3 at 27-28).

9. The Bankruptcy Court set a hearing on the objection to the proof of claim (CC3 at 26) and at that hearing sustained the objection to the claim filed by the trustee and continued the hearing on the proof of claim filed on behalf of Wells Fargo, Claim No. 6 (CC3 at 33), until March 8, 2010 (CC3 at 33).

10. On March 8, 2010 the Bankruptcy Court conducted a hearing involving Bettenhausen's objection to the Wells Fargo proof of claim and denied the objection. (CC3 at 40-42).

11. Thereafter, the Bankruptcy Court dismissed the Second Bankruptcy Case. (Peterson Affidavit at ¶7 and Exhibit 6).

12. That on September 6, 2001 Bettenhausen signed a promissory note in the original principal amount of $28,800.00 (the "Home Note") together with interest thereon. (Blocher Affidavit at ¶7 and Exhibit "1").

13. That Wells Fargo is in possession of the original of the Home Note. (Blocher Affidavit at ¶ 7).

14. That the Home Note evidenced an advance for business purposes, (Blocher Affidavit at ¶7 and Exhibit "1", page 2 at the very bottom of the page).

15. The Home Note has not been sold or transferred to any other party. (Blocher Affidavit at ¶7).

16. The Home Note was originated by Wells Fargo, when known as Wells Fargo Bank Nebraska, N.A. and Wells Fargo Bank Nebraska, N.A. was consolidated into Wells Fargo on November 21, 2003. (Blocher Affidavit at ¶ 8).

17. The Home Note was secured by the trust deed dated September 6, 2001 recorded in the real estate records of Cuming County, Nebraska on September 7, 2001 at Book 171, Mortgages, Pages 779-783 (the "Home Trust Deed"); with future advances capped at $28,800.00. (Blocher Affidavit at ¶8 and Exhibit "18").

18. The beneficiary listed in the Home Trust Deed is Wells Fargo, when known as Wells Fargo Bank Nebraska, N.A. and that Wells Fargo Bank Nebraska, N.A. was consolidated into Wells Fargo on November 21, 2003. (Blocher Affidavit at ¶8 ).

19. That the Home Trust Deed has not been sold or transferred and is still owned by Wells Fargo. (Blocher Affidavit at ¶ 8).

20. Bettenhausen defaulted under the terms of the Home Note by failing to make the payment due on the Home Note on its maturity, August 15, 2006; that as of June 28, 2010 there remained unpaid under the Home Note the sum of $6,127.71, consisting of an unpaid principal balance of $5,375.28, interest through June 28, 2010 of $752.43; and that interest accrues at the daily rate of $1.25 from and after June 28, 2010. (Blocher Affidavit at ¶ 9).

21. Wells Fargo is the owner and holder of the Home Note and of the indebtedness evidenced thereby. (Blocher Affidavit at ¶10).

22. On June 28, 2010, Wells Fargo sold the home under Home Trust Deed; that the home was sold to Wells Fargo, the highest bidder at the sale, for the sum of $10,000.00. (Blocher Affidavit at ¶9).

23. That Wells Fargo incurred the sum of $3,630.00 in trustee's fees and $783.25 in expenses in exercising the power of sale under the Home Trust Deed. (Peterson Affidavit ¶12).[5]

24. That Industrial Fabricators, Inc. ("Industrial Fabricators") was a corporation duly organized and operated under the laws of the State of Nebraska, with its principal place of business in West Point, Cuming County, Nebraska. (Blocher Affidavit at ¶12).

25. That Bettenhausen was, at all times relevant hereto, the president of Industrial Fabricators. (Id.)

26. That Industrial Fabricators was dissolved by the Nebraska Secretary of State's office on or about April 16, 2002 for non-payment of the corporate franchise tax. (Id.).

27. That on October 24, 2000, Bettenhausen on behalf of Industrial Fabricators signed, executed, made and delivered to Wells Fargo a promissory note in the original principal amount of $95,000.00 (the note, together with the modifications described below being referred to as the "Note 125") together with interest thereon; that the Note 125 was duly signed on behalf of Industrial Fabricators by its president and duly authorized officer, Bettenhausen, in his capacity as the president of Industrial Fabrications. (Blocher Affidavit at ¶13 and Exhibit "2").

28. Wells Fargo is in possession of the original of Note 125 and Note 125 and the modifications described below have not been sold or transferred by Wells Fargo. (Blocher Affidavit at ¶ 13).

29. On December 20, 2001, Bettenhausen on behalf of Industrial Fabricators signed a Modification of Note, modifying Note No. 125 to extend the maturity date to January 15, 2002. (Blocher Affidavit at ¶ 14, Exhibit 3).

---

[5] The evidence does not support this statement.  The fees and expenses are not limited to the sale of the house, but also pertain to the sale of the commercial lot.

30. That on March 13, 2002, Bettenhausen on behalf of Industrial Fabricators signed a Modification of Note, modifying Note No. 125 to extend the maturity date to extend the maturity date to May 1, 2002. (Blocher Affidavit at ¶15, Exhibit 4).

31. That Industrial Fabricators defaulted under the terms of the Note 125 by failing to make the payments due on the maturity date of Note 125; that as of June 28, 2010 there remained due and owing on Note 125 the sum of $36,039.30; consisting of an unpaid principal balance of $32,105.97, interest through June 28, 2010 of $3,933.33; and that interest accrues at the daily rate of $3.79 from and after June 28, 2010. (Blocher Affidavit at ¶ 16).

32. Note 125 was originated by Wells Fargo, when known as Wells Fargo Bank Nebraska, N.A. and that Wells Fargo Bank Nebraska, N.A. was consolidated into Wells Fargo on November 21, 2003. (Blocher Affidavit at ¶ 17).

33. On October 24, 2000, Bettenhausen on behalf of Industrial Fabricators signed, executed, made and delivered to Wells Fargo a promissory note in the original principal amount of $40,000.00 ( the note, together with the modifications described below being referred to as the "Note 158") together with interest thereon; that the Note 158 was duly signed on behalf of Industrial Fabricators by its president and duly authorized officer, Bettenhausen, in his capacity as the president of Industrial Fabrications. (Blocher Affidavit at ¶18 and Exhibit "5").

34. Wells Fargo is in possession of the original of Note 158. (Blocher Affidavit at ¶18).

35. On December 20, 2001 Bettenhausen on behalf of Industrial Fabricators signed and delivered to Wells Fargo a Modification of Note, modifying Note 158 to extend the maturity date to January 15, 2002. (Blocher Affidavit at ¶19 and Exhibit "6").

36. On March 13, 2002 Bettenhausen on behalf of Industrial Fabricators signed and delivered to Wells Fargo a Modification of Note,

7

modifying Note 158 to extend the maturity date to May 1, 2002. (Blocher Affidavit at ¶ 20 and Exhibit "7").

37. Industrial Fabricators defaulted under the terms of the Note 158 by failing to make the payments due on the maturity date of Note 158; that as of June 28, 2010 there remains due and owing on Note 158 the sum of $44,668.83; consisting of an unpaid principal balance of $40,000.00, interest through June 28, 2010 of $4,668.83; and that interest accrues at the daily rate of $4.72 from and after June 28, 2010. (Blocher Affidavit at ¶ 21).

38. Note 158 has not been sold or transferred to any other party. Note 158 was originated by Wells Fargo, when known as Wells Fargo Bank Nebraska, N.A. and that Wells Fargo Bank Nebraska, N.A. was consolidated into Wells Fargo on November 21, 2003. (Blocher Affidavit at ¶ 22).

39. On July 13, 2001, Industrial Fabricators signed, executed, made and delivered to Wells Fargo a promissory note in the original principal amount of $31,844.57 (the note, together with the modifications described below being referred to as the "Note 208") together with interest thereon; that Note 208 was duly signed on behalf of Industrial Fabricators by its president and duly authorized officer, Bettenhausen, in his capacity as the president of Industrial Fabrications. (Blocher Affidavit at ¶23 and Exhibit "8").

40. Wells Fargo has possession of the original of Note 208. (Blocher Affidavit at ¶26).

41. On October 29, 2001 Bettenhausen on behalf of Industrial Fabricators signed and delivered to Wells Fargo a Modification of Note, modifying Note 208 to extend the maturity date to October 15, 2005. (Blocher Affidavit at ¶ 24; and Exhibit "9").

42. Industrial Fabricators defaulted under the terms of the Note 208 by failing to make the payments due on the maturity date of Note 208; that as of June 28, 2010 there remains due and owing on Note 208 the sum of $32,002.65; consisting of an unpaid principal balance of

$29,574.79, interest through June 28, 2010 of $2,427.86; and that interest accrues at the daily rate of $3.48 from and after June 28, 2010. (Blocher Affidavit at ¶ 25).

43. That Note 208 has not been sold or transferred to any other party. Note 208 was originated by Wells Fargo, when known as Wells Fargo Bank Nebraska, N.A. and that Wells Fargo Bank Nebraska, N.A. was consolidated into Wells Fargo on November 21, 2003. (Blocher Affidavit at ¶ 26).

44. That on August 3, 2001, Industrial Fabricators signed, executed, made and delivered to Wells Fargo a promissory note in the original principal amount of $29,000.00 (the note, together with the modifications described below being referred to as the "Note 216") together with interest thereon; that Note 216 was duly signed on behalf of Industrial Fabricators by its president and duly authorized officer, Bettenhausen, in his capacity as the president of Industrial Fabrications. (Blocher Affidavit at ¶27 and Exhibit "10").

45. Wells Fargo has the original of Note 216 in its possession. (Blocher Affidavit at ¶27).

46. On October 29, 2001 Bettenhausen on behalf of Industrial Fabricators signed and delivered to Wells Fargo a Modification of Note, modifying Note 216 to extend the maturity date to December 1, 2001. (Blocher Affidavit at ¶ 28; and Exhibit "11").

47. On December 20, 2001 Bettenhausen on behalf of Industrial Fabricators signed and delivered to Wells Fargo a Modification of Note, modifying Note 216 to extend the maturity date to January 15, 2002. (Blocher Affidavit at ¶29 and Exhibit "12").

48. On March 13, 2002 Bettenhausen on behalf of Industrial Fabricators signed and delivered to Wells Fargo a Modification of Note, modifying Note 216 to extend the maturity date to May 1, 2002. (Blocher Affidavit at ¶ 30; and Exhibit "13").

49. Industrial Fabricators defaulted under the terms of the Note 216 by failing to make the payments due on the maturity date of Note 216; that as of June 28, 2010 there remains due and owing on Note 216 the sum of $25,458.46; consisting of an unpaid principal balance of $20,000.00, interest through June 28, 2010 of $5,458.46; and that interest accrues at the daily rate of $2.36 from and after June 28, 2010. (Blocher Affidavit at ¶ 31).

50. That Note 216 has not been assigned, sold or transferred to any other party. (Blocher Affidavit at ¶32).

51. Note 216 was originated by Wells Fargo, when known as Wells Fargo Bank Nebraska, N.A. and that Wells Fargo Bank Nebraska, N.A. was consolidated into Wells Fargo on November 21, 2003. (Blocher Affidavit at ¶ 32).

52. On November 7, 2001, Industrial Fabricators signed, executed, made and delivered to Wells Fargo a promissory note in the original principal amount of $20,000.00 (the note, together with the modifications described below being referred to as the "Note 224") together with interest thereon; that Note 224 was duly signed on behalf of Industrial Fabricators by its president and duly authorized officer, Bettenhausen, in his capacity as the president of Industrial Fabrications. (Blocher Affidavit at ¶33 and Exhibit "14").

53. Wells Fargo is in possession of the original of Note 224. (Blocher Affidavit at ¶ 33).

54. On December 20, 2001 Bettenhausen on behalf of Industrial Fabricators signed and delivered to Wells Fargo a Modification of Note, modifying Note 224 to extend the maturity date to January 15, 2002. (Blocher Affidavit at ¶ 34; and Exhibit "15").

55. On March 13, 2002 Bettenhausen on behalf of Industrial Fabricators signed and delivered to Wells Fargo a Modification of Note, modifying Note 224 to extend the maturity date to May 1, 2002. (Blocher Affidavit at ¶35 and Exhibit "16").

56. That Industrial Fabricators defaulted under the terms of the Note 224 by failing to make the payments due on the maturity date of Note 224; that as of June 28, 2010 there remains due and owing on Note 224 the sum of $31,098.34; consisting of an unpaid principal balance of $20,000.00, interest through June 28, 2010 of $11,098.34; and that interest accrues at the daily rate of $2.36 from and after June 28, 2010. (Blocher Affidavit at ¶ 36).

57. That Note 224 has not been assigned, sold or transferred to any other party. (Blocher Affidavit at ¶37).

58. Note 224 was originated by Wells Fargo, when known as Wells Fargo Bank Nebraska, N.A. and that Wells Fargo Bank Nebraska, N.A. was consolidated into Wells Fargo on November 21, 2003. (Blocher Affidavit at ¶ 37).

59. Wells Fargo is the owner and holder of Note 125, Note 158, Note 208, Note 216, and Note 224 (collectively the "Indebtedness") and of the indebtedness evidenced thereby. (Blocher Affidavit at ¶ 38).

60. On October 24, 2000 Bettenhausen signed, executed and delivered to Wells Fargo a guaranty of the payment of the Indebtedness (the "Guaranty"). (Blocher Affidavit at ¶39 and Exhibit "17").

61. That the failure to pay under the Indebtedness is a default under the terms of the Guaranty. (Blocher Affidavit at ¶40).

62. The building lot sold for $26,700.00 at the trustee's sale. (Blocher Affidavit at ¶ 40).

63. That the Indebtedness was secured by the Deed of Trust dated February 14, 1997 recorded in the real estate records of Cuming County, Nebraska on February 18, 1997 at Book 145, Mortgages, Page 665-668 (the "Lot Trust Deed"), with future advances capped at $210,000.00. (Blocher Affidavit at ¶41 and Exhibit "19").

64. The beneficiary listed in the Lot Trust Deed is First National Bank of West Point ("FNB"). That FNB was merged into Wells Fargo

Bank Nebraska, N.A. in 2000; and that Wells Fargo Bank Nebraska, N.A. was consolidated into Wells Fargo on November 21, 2003. (Blocher Affidavit at ¶41).

65. That the Lot Trust Deed has not been sold or transferred to any other party. (Blocher Affidavit at ¶ 41).

66. That in its proof of claim filed in the Second Bankruptcy Case, Wells Fargo claimed the following amounts due:

| Note | Date | Principal | Int to 2-2-09 | Total | Daily |
|------|------|-----------|---------------|-------|-------|
| 050 | 9/6/01 | 5,375.28 | 113.68 | 5,488.96 | 1.25 |
| 125 | 10/24/00 | 32,105.97 | 1,996.64 | 34,102.61 | 4.46 |
| 158 | 10/24/00 | 40,000.00 | 2,256.91 | 42,256.91 | 5.56 |
| 208 | 7/13/01 | 29,574.79 | 649.68 | 30,224.47 | 4.09 |
| 216 | 8/3/01 | 20,000.00 | 4,252.50 | 24,252.50 | 2.78 |
| 224 | 11/7/01 | 20,000.00 | 9,892.38 | 29,892.38 | 2.78 |
| | Total | 147,056.04 | 19,161.79 | 166,217.83 | 20.92 |

(CC1 at 4).

67. The same amounts are shown in the Lundgren Declaration at ¶7 (CC2 page 2).

68. That in his schedules, filed in the Second Bankruptcy Case Bettenhausen valued the House at $40,000.00 and the commercial lot at $29,000.00. (CC1 at 13).

69. In his capacity as the attorney for Wells Fargo, Peterson caused notices of default to be filed on August 5, 2004 (Peterson Affidavit at ¶4 and Exhibits "3" and "4").

70. That Peterson was substituted as trustee under the Home Trust Deed and the Lot Trust Deed by the substitutions of trustee recorded in the real estate records of Cuming County, Nebraska on September 1, 2004. (Peterson Affidavit at ¶3 and Exhibits "1" and "2").

12

71. That prior to the sales scheduled for the House and the Lot, Bettenhausen filed the First Bankruptcy Case on October 25, 2005 at Bk 05-85870. (Peterson Affidavit at ¶5).

72. Bettenhausen filed the Second Bankruptcy Case under Chapter 13 of the Bankruptcy Code on February 2, 2009 at Bk 09-80223 (the "Second Bankruptcy Case"). (Peterson Affidavit at ¶6; CC1 at 6).

73. Following the dismissal of the Second Bankruptcy, Peterson refiled the notices of default under the Home Trust Deed and the Lot Trust Deed. (Peterson Affidavit at ¶9 and Exhibits "8" and "9").

74. The Notices of Default were served on interested parties, including parties who were listed on the title report obtained for purposes of the foreclosure case, by certified mail, within 10 days after the filing of the notices of default. (Peterson Affidavit at ¶9 and Exhibit "10").

75. On May 12, 2010, more than one month after the filing of the notices of default, publication of the notices of trustee's sales was commenced in the West Point News, a legal newspaper in Cuming County, Nebraska. (Peterson Affidavit at ¶10 and Exhibit "11").

76. On May 13, 2010, notice of the trustee's sales was served on Bettenhausen and other interested parties by certified mail, that the notices of trustee's sales were served at least 20 days prior to the trustee's sales. (Peterson Affidavit at ¶10 and Exhibit "11").

77. On June 28, 2010 Peterson sold the house and the Lot to Wells Fargo at the trustee's sales. (Peterson Affidavit at ¶ 11).

78. On June 28, 2010, Peterson recorded deeds to the House and the Commercial Lot to Wells Fargo. (Peterson Affidavit at ¶11 and Exhibits "12" and "13").

79. Wells Fargo incurred the sum of $3,630.00 in trustee's fees and $483.25 [sic] [6] in expenses associated with the sales of the House and the Lot. (Peterson Affidavit at ¶12 and Exhibit "14").

80. That the trustee's fees and expenses were fair and reasonable for the services rendered and were actually incurred by Wells Fargo. (Peterson Affidavit at ¶12 and Exhibit "14").

(Filing 48, at 2-16.)

## II. Discussion

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *See Dancy v. Hyster Co., 127 F.3d 649, 652-53 (8th Cir. 1997)*. It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial. *See Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999)*.

The moving party bears the burden of showing there are no genuine issues of material fact. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)*. However, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc., 477*

---

[6] Peterson's affidavit and the attached Ex. 14 show that the expenses totaled $783.25, as previously stated in paragraph 23.

U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)) (internal marks omitted).

Bettenhausen complains that Wells Fargo's motion for summary judgment is premature because he has not been able to conduct discovery. He has not, however, filed an "affidavit or declaration [showing] that, for specified reasons, [he] cannot present facts essential to justify [his] opposition" to the motion. Fed.R.Civ.P. 56(d). Without such a showing, there is no basis for denying or deferring consideration of the motion. In any event, Wells Fargo waited until the deadline established by the court's progression schedule before filing the motion for summary judgment.

Wells Fargo argues that the bankruptcy court's overruling of Bettenhausen's objection to its proof of claim precludes Bettenhausen from contesting his liability for the amounts claimed by Wells Fargo in the second bankruptcy proceeding. I agree that Bettenhausen should not be allowed "a second bite at the apple."

"[T]he allowance or disallowance of 'a claim in bankruptcy is binding and conclusive on all parties or their privies, and being in the nature of a final judgment, furnishes a basis for a plea of res judicata.'. . . [T]he allowance or disallowance of a claim in bankruptcy should be given like effect as any other judgment of a competent court, in a subsequent suit against the bankrupt or any one in privity with him." *Beyene v. Farmland Foods, Inc.*, No. 8:05CV91, 2006 WL 120144, *2 (D.Neb. Jan. 17, 2006) (Kopf, J.) (quoting *Siegel v. Federal Home Loan Mortg. Corp.*, 143 F.3d 525, 529 (9th Cir.1998)). Although Bettenhausen's second Chapter 13 bankruptcy case was dismissed,[7] the bankruptcy court's adjudication on the merits of Wells

---

[7] A review of the bankruptcy court file (Case No. BK 09-80223) discloses that the dismissal was involuntary. On March 9, 2010, Wells Fargo filed a motion under 11 U.S.C. § 1307 to convert Bettenhausen's Chapter 13 case to a Chapter 7 case, or, in the alternative, to dismiss the case for unreasonable delay and failing to file an amended plan. (Bankr.Ct. filing 110.) The bankruptcy court granted the motion and

Fargo's claim is binding. *Cf. Baldwin v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, L.L.C.*, No. 98C4280, 1999 WL 284788 (N.D.Ill. Apr. 26, 1999) (dismissing action brought under Fair Debt Collection Practices Act as barred by res judicata where plaintiff failed to object to proof of claim filed by defendant in plaintiff's earlier Chapter 13 bankruptcy proceeding even though that proceeding was involuntarily dismissed after confirmation of bankruptcy plan); *In re Pearson*, 214 B.R. 156, 160 (Bkrtcy. N.D.Ohio 1997) ("It has been held that when a Chapter 13 plan is abandoned by debtor, creditors are no longer bound by the terms of the plan and the debtor is barred from claiming any benefits provided thereunder. . . .However, this rule is inapplicable when an objection to claim has been made independent of the plan, and claim has been adjudicated. In such a circumstance, the claim has been properly litigated in Bankruptcy Court, a Court of competent jurisdiction, and the doctrine of res judicata applies.").

"Under res judicata 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Yankton Sioux Tribe v. U.S. Dept. of Health and Human Services*, 533 F.3d 634, 639 (8th Cir. 2008) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). When objecting to Wells Fargo's proof of claim, Bettenhausen could have raised all of the matters that he now asserts as counterclaims or affirmative defenses.[8]

Consequently, I find it is uncontroverted that Bettenhausen owed Wells Fargo the sum of $166,217.83 as of February 2, 2009, the date the second Chapter 13 proceeding was filed. Wells Fargo argues it is also entitled to collect interest after

---

dismissed the case on April 1, 2010, stating: "Debtor failed to respond to the motion after being duly provided with notice and opportunity to resist. Further, the motion is well grounded under 11 USC 1307(c)(1), (3) and (4)." (Bankr.Ct. filing 122; Dist. Ct. filing 47-1, at 13.)

[8] In any event, Bettenhausen has failed to show that there is any evidence to support his allegations.

that date at the per diem rates shown in an attached summary of exhibits submitted in support of its proof of claim (filing 47-3, at 4) and in the Lundgren declaration submitted in resistance to Bettenhausen's objection (filing 47-4, at 2), but in the second amended complaint (filing 25) and in the Blocher affidavit submitted in support of its motion for summary judgment (filing 47-2), Wells Fargo has claimed a lesser amount of interest for each of the five loans that were made to Industrial Fabricators and guaranteed by Bettenhausen. I conclude that through its pleadings, and based on its own statement of material facts, Wells Fargo has effectively waived any claim for the higher per diem rates. The Blocher affidavit establishes that as of June 28, 2010, the date of the trustee's sale, $6,127.71 was owing on the home note and a total of $169,267.61 was owing on the five notes executed by Industrial Fabricators.[9]  The following tables provide details:

| Note | Date | Principal | Int to 6-28-10 | Total | Daily |
|------|------|-----------|----------------|-------|-------|
| 050 | 9/6/01 | 5,375.28 | 752.43 | 6,127.71 | 1.25 |

| Note | Date | Principal | Int to 6-28-10 | Total | Daily |
|------|------|-----------|----------------|-------|-------|
| 125 | 10/24/00 | 32,105.97 | 3,933.33 | 36,039.33 | 3.79 |
| 158 | 10/24/00 | 40,000.00 | 4,668.83 | 44,668.83 | 4.72 |
| 208 | 7/13/01 | 29,574.79 | 2,427.86 | 32,002.65 | 3.48 |
| 216 | 8/3/01 | 20,000.00 | 5,458.46 | 25,458.46 | 2.36 |
| 224 | 11/7/01 | 20,000.00 | 11,098.34 | 31,098.34 | 2.36 |
| | Total | 141,680.76 | 27,586.82 | 169,267.61 | 16.71 |

Wells Fargo describes this action as being one to collect a "deficiency" under the Nebraska Trust Deeds Act, but this is only true with respect to the note which was secured by the deed of trust for Bettenhausen's house. The five loans to Industrial Fabricators were secured by a deed of trust for a commercial lot, but Bettenhausen's guaranty of those loans was unsecured. Thus, the Trust Deeds Act is not directly

_____

[9] If the per diem rates shown in the Lundgren declaration were used instead, the total amount owing on the five Industrial Fabricator notes as of June 28, 2010, would be $170,780.14, and thereafter interest would accrue at the rate of $19.67 per day.

applicable to Wells Fargo's claim arising from the guaranty. *See Boxum v. Munce*, *751 N.W.2d 657, 662-63 (Neb.App. 2008)* (holding that action was not barred by Nebraska Trust Deeds Act's 3-month statute of limitations because "[i]t is not a suit to collect a deficiency on the obligation secured by the foreclosed trust deed, but, rather, it is a suit to collect on a separate and different contract – the [defendants'] guaranty."). As will be explained later, however, the Act may affect the amount of indebtedness on the notes that Bettenhausen guaranteed.

Regarding the "home note," it is undisputed that Bettenhausen owed the sum of $6,127.71 in principal and interest as of June 28, 2010, on which date Wells Fargo purchased Bettenhausen's house at the trustee's sale for $10,000.00. While stating that "no deficiency" remains on the note, Wells Fargo asserts that the sale proceeds were not sufficient to pay all of the trustee's fees and expenses. That is, Wells Fargo would first apply the $10,000.00 in proceeds against the $6,127.71 loan balance, and then apply the balance of $3,872.29 against the $4,413.25 claimed as trustee's and expenses; the difference of $540.96 would then be recouped from the proceeds of the trustee's sale of the commercial lot that secured the Industrial Fabricators notes.[10]

Under the Nebraska Trust Deeds Act, the proceeds of the trustee's sale apply "first, to the costs and expenses of exercising the power of sale and of the sale, including the payment of the trustee's fees actually incurred . . ., second, to payment of the obligation secured by the trust deed, . . . and the balance, if any, to the person or persons legally entitled thereto." Neb. Rev. Stat. § 76-1011. "Under § 76-1013,

---

[10] Wells Fargo explains the matter somewhat differently, stating: "Wells Fargo is entitled to assess the trustee's fees and expenses against the sales proceeds first and then apply the balance to the Home Note. Wells Fargo incurred trustee's fees and expenses of $4,413.25 in the exercise of the power of sale. Wells Fargo will elect to apply $3,872.29 of the bid to its trustee's fees and expenses and apply the balance of the sales proceeds, $6,127.71, to pay off the Home Note. That will leave a total of $540.96 in unpaid trustee's fees and expenses to allocate to the Lot." (Filing 48, at 31-32.)

a court may allow a deficiency judgment in certain circumstances. . . . The court must first determine the fair market value of the property. The court must next compare the fair market value of the property to the sale price to determine which is the greater amount. Finally, the court must subtract this greater amount from the total indebtedness [including trustee's fees and expenses] to arrive at the amount of the deficiency. The amount of the deficiency represents the amount still due and owing to the creditor. Accordingly, a finding of 'no deficiency' is tantamount to a finding that nothing is due and owing to the creditor because either the value of the property or the proceeds of the sale were sufficient to satisfy the debt." *Pantano v. Maryland Plaza Partnership*, 507 N.W.2d 484, 487-88 (Neb. 1993).

Wells Fargo has presented evidence that it is entitled to apply the proceeds from the sales of the house and commercial lot in payment of $3,630.00 in trustee's fees and $783.25 in expenses. Although these fees and expenses are itemized, Wells Fargo has not attempted to identify which particular items were actually incurred in connection with the house sale, the lot sale, or both. This missing information is not critical, though, because any surplus associated with the home sale will be credited against Bettenhausen's obligation on the guaranty.[11]

Although it is questionable whether Bettenhausen is entitled to the protection of the Nebraska Trust Deeds Act with respect to his obligation on the guaranty, Wells Fargo has deducted from the amount owing on the Industrial Fabricators notes the stated fair market value of the commercial lot of $29,000.00 rather than the lesser sale price of $26,700.00. (Filing 48 at 30-31, and attachment.) I will do the same.

As of June 28, 2010, the amount owing on the "home note" was $6,127.71 and the amount owing on the other five notes was $169,267.61, for a total of $175,395.32.

---

[11] There can be no deficiency because Wells Fargo has accepted Bettenhausen's statement that the fair market value of the house is $40,000.00, which far exceeds the amount of total indebtedness on the "home note."

The trustee's fees and expenses for both sales were $4,413.25, which brings the total indebtedness to $179,808.57. Deducting the $10,000.00 sale price for the house and the $29,000.00 fair market value of the commercial lot results in a final liability of $140,808.57.[12] Because this amount is slightly less than the principal amount of $141,680.76 upon which Wells Fargo (in the Blocher affidavit) calculated a per diem interest charge of $16.71, a new calculation must be made. Using a percentage interest rate of 4.3% ($16.71 x 365 = $6,099.15 ÷ $141,680.76 = .0430), the per diem is $16.59 ($140,808.57 x .0430 = $6,054.77 ÷ 365 = $16.59). Thus, Wells Fargo is entitled to recover from Bettenhausen the sum of $140,808.57 plus per diem interest of $16.59 from and after June 28, 2010.

### III. Conclusion

I find no genuine issues of material fact, and conclude that Wells Fargo should recover the amount requested in its brief, with the exception of certain interest charges which are not consistent with Wells Fargo's pleadings or the affidavit filed in support of Wells Fargo's motion for summary judgment.

Accordingly,

IT IS ORDERED:

1.  The defendant's motion for reconsideration (filing 36), treated as a motion for summary judgment, is denied.

2.  The plaintiffs' motion for summary judgment (filing 46) is granted.

---

[12] As calculated by Wells Fargo, the liability is $142,321.10. The difference of $1,512.53 is due to the difference in per diem interest charges allowed between February 2, 2009, and June 28, 2010.

3.      Judgment shall be entered by separate document, generally providing that Wells Fargo shall recover from the defendant $140,808.57 plus per diem interest of $16.59 from and after June 28, 2010.


February 25, 2011.                    BY THE COURT:

                                      *Richard G. Kopf*
                                      United States District Judge

--------

        * This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.